NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0193n.06

No. 08-4050

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Feb 16, 2012*

LEONARD GREEN, Clerk

ANGELO FEARS,                                    )
                                                 )          ON APPEAL FROM THE
    *Petitioner-Appellant,*                      )          UNITED STATES DISTRICT
                                                 )          COURT FOR THE SOUTHERN
v.                                               )          DISTRICT OF OHIO
                                                 )
MARGARET BAGLEY,                                 )                    O P I N I O N
                                                 )
    *Respondent-Appellee.*                       )

BEFORE:     MARTIN, COLE, and ROGERS, Circuit Judges.

COLE, Circuit Judge.   In this capital case, Petitioner-Appellant Angelo Fears appeals the

denial of his petition for a writ of habeas corpus by the district court.  Fears, convicted and sentenced

to death in 1998 for the aggravated murder of Antwuan Gilliam, alleges multiple instances of

prosecutorial misconduct, ineffective assistance of trial and appellate counsel, and jury instruction

error.  Because neither the Ohio Supreme Court on direct review, nor the Ohio Court of Appeals on

collateral review, applied clearly established federal law in an objectively unreasonable manner, we

AFFIRM the judgment of the district court.

I.  BACKGROUND

No background facts are in dispute.  The Supreme Court of Ohio, in affirming Fears's

conviction and sentence, made the following findings of fact:

During the early morning hours of March 30, 1997, Antwuan Gilliam was shot to death in a high-crime area in Cincinnati known as "Over–the–Rhine. . . ."

At around 1:00 a.m., Gilliam was on the street outside his apartment talking to his girlfriend, Keyona Haynes. Gilliam's friend, Steven Franklin, approached him and asked where Derrick Frazier was because he wanted to purchase two ounces of crack cocaine. . . .

Frazier came outside and then took Franklin to another apartment, where he kept the crack cocaine while staying with his friend, Lakesha Bryant. Bryant opened the door, let the men in, and went back to bed. Her young child was asleep in another bedroom. Frazier retrieved two ounces of crack cocaine from the safe, and put the drugs on the kitchen table. In the meantime, James Grant and appellant pulled up in a van and were seen talking to Gilliam outside the apartment building. Gilliam knocked on the door when Frazier and Franklin were discussing the price of the drug transaction. Frazier let Gilliam in, but as Gilliam was closing the door, James Grant stepped inside the apartment. At first, Grant asked to buy a small amount of crack cocaine, but then pulled out a gun and aimed it at Franklin, who was holding $2,000 in his hands, and told him to "lay it down." At this point, appellant entered the apartment with a gun in his hand. Franklin dropped the money and James told appellant to pick it up. Appellant took the money as well as Franklin's bracelets and rings.

Franklin and Gilliam dropped to the floor. According to Franklin, Grant then told appellant, who by that time was armed with a gun in each hand, to "shoot one of them niggas." Appellant pointed the gun at Gilliam, but Grant said, "no, shoot him" referring to one of the other men. Appellant said, "No, I'm going to shoot him [Gilliam]." Appellant pointed his gun at Gilliam's buttocks and said "I should shoot you right here in your bootie." Gilliam pleaded with him not to kill him, but appellant told Gilliam, "I don't give a fuck about killing you." Appellant then fired a single shot into Gilliam's left temple, killing him.

. . . .

Appellant was found guilty in a jury trial as charged, and the case proceeded to the penalty phase. Appellant presented testimony from several family members who detailed his abusive and neglected upbringing. A psychologist also testified that appellant has a low I.Q. of between seventy-five and eighty, is alcohol-dependent, and suffers from a personality disorder. The jury recommended that appellant be sentenced to death. The trial court adopted the jury's recommendation and imposed the death penalty on appellant.

*State v. Fears*, 715 N.E.2d 136, 141-142 (Ohio 1999). The Ohio Supreme Court upheld Fears's

conviction, and after independently reweighing the aggravating and mitigating factors, upheld his

sentence of death as well. *Id.* at 143.

Fears filed a notice of his intent to file a petition for a writ of habeas corpus in federal district

court. A magistrate judge granted Fears's motion for an evidentiary hearing, leading to the

deposition of six witnesses. The district court subsequently adopted the magistrate judge's Reports

and Recommendations, and denied Fears's petition. This appeal followed.

## II. ANALYSIS

We review a district court's denial of a petition for a writ of habeas corpus de novo, but

review any factual determinations made by the district court for clear error. *Davis v. Coyle*, 475 F.3d

761, 766 (6th Cir. 2007). Since Fears filed his petition in the district court in 2001, the Antiterrorism

and Effective Death Penalty Act of 1996 ("AEDPA") applies to all claims that have been

"adjudicated on the merits in State court proceedings . . . ." 28 U.S.C. § 2254(d).

For those claims presented and adjudicated in the state courts, AEDPA limits a federal habeas

court from granting relief unless the state court's adjudication of the claim "(1) resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding." *Id.* "This is a difficult to meet and highly deferential standard for evaluating state-

court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen

v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks and citations omitted). We

may rely on only the record that was before the state court in overcoming AEDPA's deference requirements. *Id.* at 1400.

Fears asserts multiple claims of error, including prosecutorial misconduct during the guilt and penalty phases of his trial, ineffective assistance of trial and appellate counsel, and improper jury instructions. We address each in turn.

## A. Prosecutorial Misconduct

"The relevant question in analyzing a claim for prosecutorial misconduct on habeas review is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008) (internal quotation marks and citations omitted). We must first determine whether the prosecutors' statements were in fact improper. *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006). If they were, then a four-factor test is applied to determine whether the impropriety was flagrant. *Id.* The four factors are as follows: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (citing *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994)).

### 1. During the guilt phase

Fears submits that multiple statements made during the guilt phase of his trial constituted prosecutorial misconduct. To wit:

- During voir dire, one of the prosecutors told a prospective juror, "This is a case where, obviously, a firearm was discharged. And from what the defense has told us so far, *it seems like one of the key issues that you're going to be* – I mean, there is no doubt there is a dead person. He was alive before he had contact with Angelo Fears. And after the boom, he is not alive anymore. *So it appears that one of the major issues that you will be deciding here*, apart from the hot death-penalty issues . . . ." (emphasis added). An objection was sustained, and the prosecutor rephrased the statement. A curative instruction was neither requested nor given. Fears claims that the comment placed upon him a burden of proving his innocence via a defense of accident.

- A prosecutor, when articulating his basic theory of the case, stated that Fears and Grant were going to the scene of the crime, "planning to rob everybody involved regardless of the cost, regardless of what they had to do. They were going to rob people. If they had to kill somebody they were going to do it." The trial court sustained defense counsel's objection, and though Fears argued to the Ohio Supreme Court that a curative instruction should have been given, the record does not reflect a request for such an instruction.

- Also during voir dire, that same prosecutor asked a prospective juror whether it would be possible to ascertain Fears's intent "without having them help us figure that out?" The court sustained an objection from defense counsel. The court did not give a curative instruction, though the prosecutor immediately back-pedaled and clarified that Fears had no burden to carry.

- During closing argument, the prosecution told the jury that "[Fears] is bringing a loaded semi-automatic. If you only want to scare somebody, why did he have it loaded? Bring it in and pointed [sic] it. It's clear he is going to tell you that he never was going to kill him. Gun wasn't loaded." Defense counsel immediately objected, and the trial court sustained the objection finding it to be "well-taken." A few moments later, at the close of the prosecution's argument, the trial court told the jury that they should "disregard [the prosecutor's] comment that [defense counsel] will tell you something because, as I will tell you—instruct you that the law that you will apply in this case is that the defendant has a constitutional right not to testify; that the fact he did not testify cannot be considered by you for any reason."

- Also during closing argument, a prosecutor stated that Fears's counsel performed "magic" and engaged in a "slight of hand technique." No objection was levied, nor was this sub-claim raised on direct review by the Ohio Supreme Court.

Reasonable minds could differ as to whether the first four statements were improper. The last statement, that Fears's counsel performed magic, is not improper. Prior to making that statement, the prosecutor praised Fears's counsel as an excellent lawyer, suggesting that the statement was a critique of defense counsel's trial strategy, not of defense counsel themselves. *See Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) ("Case law permits comments that are made in response to the argument and strategy of defense counsel.") (internal quotation marks and citations omitted). Even if this were not the case, this sub-claim is defaulted because Fears did not raise it on direct review.

Assuming that the first four statements were improper, they were not flagrant. The statements did not mislead the jury. Fears argues that the first statement, about a potential defense that might be raised, improperly placed upon him a burden to prove a defense of accident. Such a reading is strained at best, and defense counsel framed the issue in the same way when he stated "[t]o do an act purposely is to do it intentionally and not accidentally." The second statement, to which Fears objected because it presumed his intent, was unlikely to mislead the jury or prejudice the defendant, because a reasonable juror would in this case realize that she need not accept the prosecutor's version of events. Defense counsel lodged objections to each of the four statements, and the objections were sustained by the trial court. And, in the case of the third and fourth statements, either the prosecutor himself or the trial court made comments mitigating the statements' effects. "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will

be unable to follow the court's instructions . . . ." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)

(internal quotation marks and citation omitted). No such overwhelming probability exists here.

The remarks were also not extensive because each was made in isolation, and none was

repeated after an objection. These four comments took place during a guilt phase that comprises

over 1200 pages of the trial transcript. The misconduct was not "so pronounced and persistent that

it permeate[d] the entire atmosphere of the trial or so gross as probably to prejudice the defendant."

*Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotation marks and citations

omitted). The lack of repetition, as well as a review of the context in which the improper statements

were made, further demonstrates that the comments were not made intentionally.

Finally, there was overwhelming evidence of Fears's guilt, which "can oftentimes be

sufficient to sustain a conviction despite some prosecutorial misconduct." *Bates v. Bell*, 402 F.3d

635, 648-49 (6th Cir. 2005). There is no dispute that Fears shot and killed Gilliam; rather, Fears's

sole defense is that the gun accidentally misfired. Regardless, the statements were not misleading,

were made in isolation, and made in the heat of the moment rather than deliberately. Taken together,

the Ohio Supreme Court properly assessed that "none of the alleged instances of misconduct that

occurred affected the fairness of [Fears's] trial," *State v. Fears*, 715 N.E. 2d at 146, and did not

unreasonably apply relevant Supreme Court precedent.

*2. During the penalty phase*

Fears argues that a number of statements by prosecutors during the penalty phase constitute

prosecutorial misconduct, and improperly swayed the jury to impose the death penalty. Fears raises

nine claims of misconduct during the penalty phase, all of which were submitted in his brief to the

Ohio Supreme Court on direct review.

The Ohio Supreme Court conducted an independent sentence review, pursuant to Ohio Rev.

Code § 2929.05(A), which requires, if death was imposed, for the reviewing court to independently

weigh the aggravating and mitigating factors present in the case. The Ohio Supreme Court

considered all of the allegations of prosecutorial misconduct, and still found:

> that the aggravating circumstances outweigh the mitigating factors present in this case beyond any reasonable doubt. The evidence revealed that appellant threatened Antwuan Gilliam during the course of a robbery involving drugs and shot him in the head even after Gilliam pleaded for his life. His actions merit the capital penalty to which he was sentenced.

*State v. Fears*, 715 N.E.2d at 155.

We have held, in a death penalty habeas case, that a reweighing of the aggravating and

mitigating factors by a state court on direct review cures impermissible remarks made by the

prosecution during the original trial. *Lundgren v. Mitchell*, 440 F.3d 754, 782-83 (6th Cir. 2006).

Of the nine statements Fears alleges to constitute prosecutorial misconduct affecting the penalty

phase, the Ohio Supreme Court found five of them to have been improperly made:

- During voir dire, the prosecutor stated that "you weigh the mitigation they give you against the facts of the crime." The Ohio Supreme Court noted this to be an incorrect statement of law. "The nature and circumstances of the offense can be weighed only against the proven aggravating circumstances . . . . With that comment, the prosecutor implied that mitigation must outweigh aggravation." *State v. Fears*, 715 N.E.2d at 144.

- In her closing argument in the mitigation phase, a prosecutor stated "there is nothing mitigating in the manner in which Angelo Fears purposely killed Antwuan Gilliam. There's no mitigation in that . . . . What kind of terror did [Fears] put into Derrick Frazier's head? He told us he peed in his pants. How is that for aggravating

circumstances? Well, I guess there some mitigation there because, you know, . . . he left [Lakesha] alone and that four-year-old baby there. He didn't touch that child. There's mitigation for you." The Ohio Supreme Court stated "it is improper for a prosecutor to suggest that . . . the suffering and mental anguish the victims endured was an aggravating circumstance . . . . These comments were improper." *Id.* at 143-44. And, that "it is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are "aggravating circumstances." *Id.* at 143.

• During the closing argument the prosecution argued that the defense's psychological expert, Dr. Smalldon, was being paid with taxpayer money. The Ohio Supreme Court deemed this comment improper, because "this comment injects an impermissible reference to taxpayer's [sic] contributions, by which the prosecutor obviously hoped to gain an unfair advantage." *Id.* at 144.

• While cross-examining Dr. Smalldon, the prosecutor referred to defense counsel as the defendant's "mouth piece." The Ohio Supreme Court found this comment improper, stating that it insinuated that "defense counsel has paid the expert simply to have him parrot their opinions. It is obviously intended to denigrate defense counsel." *Id.*

• The prosecution repeatedly made reference to Dr. Smalldon's notes, and that the notes were never turned over to the prosecution. This matter had been settled conclusively by the trial court when it ruled that the state could not receive these notes because they were work product. Despite this ruling, the prosecution repeatedly stated that Dr. Smalldon was being reluctant and unwilling to cooperate. The Ohio Supreme Court admonished the prosecution, stating that "the prosecutor should not have made these comments, which cast an improper light on Smalldon and accused him of wrongdoing and withholding of pertinent information." *Id.* at 145.

With these admonitions in place, the Ohio Supreme Court went on to conduct an independent review of Fears's sentence. *Id.* at 154. Because it did not consider the improper statements in its review, *Lundgren* instructs us to presume that those instances of misconduct were cured. The statements that the Ohio Supreme Court deemed *not* to be prosecutorial misconduct are discussed below.

During cross-examination, a prosecutor asked Dr. Smalldon, the defense expert, whether he was aware that on "October 15, 1992, [Fears] was convicted of an assault, plea bargain from a

robbery." Defense counsel objected, arguing that because Fears was never convicted on the robbery charge and the plea bargain was irrelevant to the proceeding, it should not have been introduced. The court agreed, and sustained the objection. There is no question that this statement was improper, which requires us to consider whether it was flagrant by assessing the *Carroll* factors. It likely did not mislead the jury, for a prior arrest for robbery would be probative of a pattern and practice of committing robberies, and Fears's commission of a robbery in this case was uncontroverted. The robbery charge was never mentioned again, and the evidence against Fears was strong. The lone *Carroll* factor in Fears's favor is that the remark was made deliberately. Taken as a whole, we cannot conclude that the remark was flagrant.

Fears next argues that the prosecution introduced false evidence, when, during closing argument, a prosecutor stated that "[Fears] shot them with no remorse. He shot them in front of two other people and he pistol whipped Derrick Frazier." Defense counsel immediately objected, which the court overruled. The evidence adduced at trial makes clear that it was Grant who pistol whipped Frazier. The statement could have misled the jury and prejudiced Fears, since the central question in the case was whether Fears intended to kill Gilliam. But, during the guilt phase's closing arguments, the prosecutor told the jury that it was Grant who assaulted Frazier with the gun. Considering that the statement was made in isolation, and that there is no reason to believe that it was made deliberately, the statement was not flagrant. *See Lundgren*, 440 F.3d at 778.

Additionally, during the penalty phase closing argument, a prosecutor stated that Dr. Smalldon "said [Fears] doesn't care. He is callous. He doesn't have any remorse. He doesn't regret the consequences of what he does." No objection was lodged by defense counsel. Before the

prosecutor made the statement, Fears made an unsworn statement in which he said, "I'm very sorry what happened to your son" and "I just wanted to say I'm very sorry for hurting you all's family by really taking somebody from you that you really love." The Ohio Supreme Court noted that "[s]ince appellant expressed remorse in his unsworn statement, the prosecutors did not err in making these comments." *State v. Fears*, 715 N.E.2d at 144. The district court noted that "[w]hile remorse or lack thereof is not an aggravating circumstance, the state may rebut a defendant's evidence of remorse, and may fairly comment upon any such evidence."

We agree. A defendant's statement about his remorse to a jury can be powerful, and it was not improper for the prosecution to argue the falsity of such a statement. *See Payne v. Tennessee*, 501 U.S. 808, 860 (1991) ("Just as the defendant is entitled to introduce any relevant mitigating evidence, so the State may rebut that evidence."). These statements were proper and do not constitute prosecutorial misconduct.

Fears's final claim of prosecutorial misconduct asserts that the prosecution suggested that Fears was a gang member. During the penalty phase cross-examination of Fears's sister, LaTonya Clark, a prosecutor asked the following:

Q:    All right. [Fears] is in a gang; isn't he?
A:    No.
Q:    He is not?
A:    No.

Defense counsel did not object. The Ohio Supreme Court found these statements proper and lacked prejudice because "appellant's brother had *already testified* that appellant had never been the type of person who would hurt anyone . . . . [and] appellant's sister denied any gang membership . . . ."

*State v. Fears*, 715 N.E.2d 144-45 (emphasis added).  While this is true as to the sister's testimony,

the brother's testimony took place *after* the prosecution made the statement.  The district court did

not address this error, noting instead that Fears suffered no cumulative prejudice by the question

since his sister's testimony denied his involvement.  We agree that the question was not improper

and does not constitute misconduct.  As the district court noted, "Taken in isolation, these comments

did not prejudice Fears or deprive him of a fair trial."

While the dissent in the Ohio Supreme Court opinion is correct that there were regrettable

instances of prosecutorial misconduct that occurred at trial, such regret, by itself, cannot be the basis

for habeas relief.  As the Supreme Court has noted, "[a litigant] is entitled to a fair trial but not a

perfect one, for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S.

548, 553 (1984) (internal quotation marks and citations omitted).  We cannot conclude that the

prosecutors acted so egregiously as to deny Fears a fundamentally fair penalty phase.

*B.  Ineffective Assistance of Counsel*

To establish ineffective assistance of counsel, it must be shown that counsel's performance

was deficient, and that such performance prejudiced the defense so as to render the trial unfair and

the result unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Both prongs of the test

must be met, but if any one prong fails to establish ineffective assistance, we need not conduct an

analysis under both. *Id.* at 697.  We review the district court's findings of fact pertinent to this

question for clear error, but since the performance and prejudice components of the *Strickland* test

are considered mixed questions of law and fact, those are reviewed de novo. *Id.* at 698.  Our review

"is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 131 S. Ct. at 1398.

The magistrate judge conducted an evidentiary hearing, which included six depositions and thirty-six items of evidence. Fears argues that *Pinholster* is inapplicable because he attempted to introduce much of this evidence to the state court on collateral review but was denied the opportunity to do so. Therefore, he argues, his case falls outside the scope of § 2254(d) and *Pinholster* does not apply. While true that a defect in process may allow for de novo consideration of a claim brought before the state court on collateral review, *Panetti v. Quarterman*, 551 U.S. 930, 950 (2007), Fears asserts no clearly established federal law indicating that his collateral review was defective. In his initial briefing, Fears conceded that his petition is governed by AEDPA, and never argued that the state collateral review process was defective. Not until after receiving notice of the *Pinholster* citation from the Warden did Fears argue that the process was flawed.

Because Fears did not provide any argument as to why the state court collateral review process was defective, *Pinholster* is applicable, and this Court may not consider any of the evidence produced before the magistrate judge. *Pinholster* is clear that, when evaluating whether the state courts on collateral review applied *Strickland* in an objectively unreasonable manner, we may consider only the evidence that was before that court at that time. We must be careful to ensure that federal review is "not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Williams v. Taylor*, 529 U.S. 420, 439 (2000).

    *1. During the guilt phase*

- 13 -

Fears asserts that his trial counsel was deficient in failing to obtain a firearms expert to contradict the testimony of William Schrand, the state's firearm expert, and for failing to introduce evidence of a relevant gun recall. These claims are both premised on Fears's assertion that the gun accidentally fired, and should, as the Ohio Court of Appeals recognized, be analyzed together.

Fears presented, on state collateral review, three items establishing that the gun misfired: an affidavit by Cleon Maurer, a firearms expert; a magazine page indicating that the gun in this case was subject to a recall because it could misfire; and an affidavit from a juror stating that she was unsure as to whether the gun fired accidentally and that a defense firearms expert would have been helpful. *State v. Fears*, No. C-990050, 1999 WL 1032592, at *4 (Ohio Ct. App. Nov. 12, 1999).

The Hamilton County Court of Common Pleas found that since the state's firearm witness was subject to cross-examination, and since there was no evidence that Fears mishandled the murder weapon, Fears failed to prove that his counsel's decision not to call their own firearms expert or introduce evidence of the recall prejudiced him. *Id.* Finally, the defense expert's affidavit indicated that the pistol used by Fears was subject to accidental discharge only if "dropped or otherwise carelessly handled" and that the evidence in the record indicates that "[i]t took six and one-half pounds of pressure on the trigger to cause the gun to fire. Nothing in the record demonstrates that he mishandled or dropped either gun." *Id.* at 5. Therefore, even if Fears's counsel had called its own firearm expert and produced evidence about the gun recall, the outcome would, in all likelihood, have been the same.

Fears next argues that his trial counsel was ineffective by failing to present expert testimony about Fears's level of intoxication on the night of his offense. Fears asserts that, had the jury heard

this testimony, there is a reasonable probability that the jury would not have found the requisite intent to kill. The Ohio Court of Appeals considered and rejected this claim, holding that "[t]he decision whether to pursue an intoxication defense is a trial strategy." *State v. Fears*, 1999 WL 1032592, at *6. And, that because under Ohio law "purpose and intoxication can co-exist," Fears would have *also* been required to prove that he did not "specifically intend to cause the death of Gilliam" to demonstrate prejudice. *Id.* Noting that the evidence in the record showed that "Fears terrorized Gilliam and specifically chose to kill him," Fears would be highly unlikely to be able to show a lack of specific intent, and so he could not show prejudice. *Id.*

We have recognized that state courts are not unreasonable in finding that counsel's performance was adequate when they introduce evidence that would fulfill "the same functions that a substance-abuse expert would have served." *Foust v. Houk*, 655 F.3d 524, 537-38 (6th Cir. 2011). Other testimony, such as by Dr. Smalldon or by Fears himself, illustrated that Fears suffered from substance abuse problems. As there was evidence in the record demonstrating Fears's specific intent, Fears did not suffer prejudice when his trial counsel failed to present toxicology testimony on Fears's level of intoxication on the night of the murder. In light of this, the Ohio Court of Appeals correctly applied the *Strickland* standard.

Finally, Fears argues that his trial counsel was ineffective when it failed to object to all instances of prosecutorial misconduct. Fears's trial counsel objected often to instances of prosecutorial misconduct during the guilt phase, and Fears never points to a specific situation in which he suffered prejudice when his trial counsel failed to object.

The Ohio Supreme Court dismissed this claim, stating that "[t]he failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Fears*, 715 N.E.2d at 153 (quoting *State v. Holloway*, 527 N.E.2d 831, 837 (Ohio 1988)). And, that "[s]ince [Fears] does not show that any particular failure to object substantially violated any essential duty or was prejudicial . . . ." the claim must fail. *Id.* Because "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, Fears's failure to point to specific instances of deficiency or prejudice undermines this claim.

2. *During the penalty phase*

Fears claims that his trial counsel again failed him during the penalty phase of his trial by falling below objective norms of professional conduct, and that such deficiency prejudiced him. When considering this claim, it is important to discount hindsight by "pegging adequacy to counsel's perspective at the time investigative decisions are made, and by giving a heavy measure of deference to counsel's judgments." *Rompilla v. Beard*, 545 U.S 374, 381 (2005) (internal quotation marks and citations omitted).

Fears presented this claim to the Ohio Court of Appeals on collateral review. *State v. Fears*, 1999 WL 1032592, at *6-7. At the outset, it is necessary to note that defense counsel called a number of mitigatory witnesses to testify: Fears's mother, Fears's sister, an acquaintance, a social worker, Fears's brother, Fears's stepmother, Fears's aunt, and a psychologist.

Fears argues that his trial counsel was deficient because they did not adequately utilize the services of its mitigation specialist, Martha Jacoby. In Jacoby's affidavit on post-conviction review,

she stated that she "had only one meeting with defense counsel prior to trial" and that defense counsel failed to notify her of meetings with mitigatory witnesses. The Ohio Court of Appeals dismissed the claim because "Fears failed to demonstrate how counsel's conduct prejudiced his defense." *State v. Fears*, 1999 WL 1032592, at \*7. The Ohio Supreme Court found that, the limited contact with Jacoby notwithstanding, "[i]t is evident from the line of questioning of these witnesses that defense counsel was prepared and that he was able to effectively present the mitigation testimony." *State v. Fears*, 715 N.E.2d at 153.

When assessing whether an attorney's mitigation investigation was reasonable, we consider "not only the quantum of evidence already known to counsel, but also whether that evidence should have led a reasonable attorney to investigate further." *Jalowiec v. Bradshaw*, 657 F.3d 293, 319 (6th Cir. 2011) (internal quotation marks and citations omitted). We must consider whether the mitigation investigation was reasonably complete, and whether the excluded evidence actually differed from what was presented at sentencing in a substantial way. *Id*.

Fears argues that had Jacoby been included in the discussions with defense counsel, she could have produced witnesses who would give the jury a better "sample of the turmoil that [Fears] experiences." Considering that five of the eight mitigatory witnesses testified to Fears's upbringing and family situation, we cannot say that the evidence that Jacoby might have discovered would have been substantially different. Even if Fears's trial counsel was deficient for failing to utilize Jacoby, the state court did not apply *Strickland*'s prejudice prong in an objectively unreasonable way.

Fears further asserts that trial counsel presented insufficient evidence of Fears's history of alcohol abuse, physical abuse, and intellectual limitations. Again, as this Court has noted, to

overcome the prejudice prong articulated in *Strickland*, Fears must show that this evidence would differ "in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Jalowiec*, 657 F.3d at 319 (internal quotation marks and citations omitted). He is unable to do so. As the Ohio Court of Appeals noted, Fears's aunt, mother, and brother testified to the difficulties of Fears's childhood. *State v. Fears*, 1999 WL 1032592, at *8. Fears fails to point to any evidence that should have been included that is substantially different from what was actually adduced. There is no doubt that Fears's upbringing was violent, troublesome, and unstable. But it is beyond our discretion to say that the more than 400 pages of mitigation testimony failed to convey this to the jury.

Fears also argues that his trial counsel was ineffective for failing to call a cultural expert during the penalty phase. According to Fears, the expert would have testified to the circumstances of Fears's upbringing in a violent neighborhood, the impact of the mitigating evidence, and why Fears engaged in criminal activity. The Ohio Court of Appeals noted that such a claim was not cognizable because counsel may not be found ineffective for failing to present an alternative mitigation theory. *State v. Fears*, 1999 WL 1032592, at *7.

We agree. "[T]he existence of alternative or additional mitigation theories generally does not establish ineffective assistance of counsel." *Phillips v. Bradshaw*, 607 F.3d 199, 207 (6th Cir. 2010) (citation omitted). Attorneys are not expected to present every potential mitigation theory, regardless of their relative strengths. Further, Fears cannot show prejudice because there is not a reasonable probability that, but for the cultural expert's testimony, the jury would have reached a different conclusion.

As the Ohio Supreme Court noted, "it is evident from the line of questioning of these witnesses that defense counsel was prepared and that he was able to effectively present the mitigation testimony." *State v.* Fears, 715 N.E.2d at 153. Fears argues that his trial counsel erred by presenting testimony from his brother and his mother, only to have the prosecution ask those witnesses about outstanding warrants and prior welfare fraud convictions, respectively. We, however, cannot conclusively say that such a decision was not sound trial strategy, given the powerful testimony that was ultimately produced by both witnesses. Fears fails to persuade us that the Ohio Supreme Court's assessment was in any way an unreasonable application of clearly established federal law.

Fears's final contention as to why he received constitutionally inadequate counsel during the penalty phase is that his attorneys failed to object to all instances of prosecutorial misconduct. Again, Fears provides us with no specific examples of what prosecutorial misconduct his counsel failed to object to during the penalty phase. We have already discussed all instances of alleged prosecutorial misconduct during the penalty phase in Part IV.A.2. The Ohio Supreme Court considered five statements to be improper, and we have analyzed the other four statements on the merits, regardless of whether they were procedurally defaulted due to a failure to comply with the contemporaneous objection rule. As to the statements that the Ohio Supreme Court considered improper, Fears can claim no prejudice from any failure to object, since the independent reweighing by that court effectively cured any error that accrued during the penalty phase. As to the other statements, we determined that they were not flagrant, so a failure to object did not prejudice Fears. Therefore, we cannot say that Fears's trial counsel during the penalty phase was constitutionally ineffective, in violation of *Strickland*.

C. *Ineffective Assistance of Appellate Counsel*

Fears's entire basis for relief under this claim is that appellate counsel failed to raise a claim of ineffective assistance of trial counsel, on direct appeal, based upon trial counsel's failure to object to all instances of prosecutorial misconduct. Fears fails to point to any specific statement that should have been challenged at trial or on appeal. As already discussed, Fears was not prejudiced by his trial counsel's failure to object to those statements because they did not amount to prosecutorial misconduct, or, if they did, the Ohio Supreme Court engaged in an independent reweighing of the aggravating and mitigating factors. Since the underlying claim is unsuccessful, Fears cannot argue that he was prejudiced by appellate counsel's failure to raise this issue.

D. *Improper Jury Instructions*

Fears's final assertion is that a jury instruction on the defense of accident had the effect of shifting the burden of proof to him, violating his due process rights. Prior to closing arguments in the guilt phase, the state requested an instruction of accident be given to the jury. Defense counsel objected, arguing that the definition of accident requires the defendant to have been engaged in a lawful act. The court overruled the objection, and gave the following instruction on accident:

> Now, an accidental result is one that occurs unintentionally and without any design or purpose to bring it about. An accident is a mere physical happening or event out of the usual order of things and not reasonably anticipated or foreseen as a natural or probable result of a lawful action.

The court then instructed the jury that "[t]o do an act purposefully is to do it intentionally and not accidentally. Purpose and intent mean the same thing." Fears argues that such instructions shifted

the burden to Fears to show that he lacked purpose in the killing of Gilliam, and that the jury was led to believe that if they did not find accident, then they must find purpose.

The state argues that the instruction on the defense of accident served only to clarify the element of intentional purpose by comparing it to the concept of accident, and, unlike the either/or proposition that Fears asserts, the instructions provided additional grounds for finding a lack of purpose. The Ohio Supreme Court briefly addressed the issue, denying relief because "[t]he instruction on accident, in effect, underscores the position taken by defense counsel that appellant did not intentionally cause the death of the victim," and that jury instructions must be considered as a whole. *State v. Fears*, 715 N.E.2d at 148-49. The magistrate judge was more forceful, stating that "[t]his argument is sheer conjecture on Fears's part and falls far short of demonstrating that the state court's resolution of the issue was contrary to or an unreasonable application of clearly established federal law . . . ."

Perhaps in response to this criticism, Fears lists a number of Supreme Court decisions that are purportedly in his favor. On closer inspection, none of these cases provides any such support, and they rather merely articulate the broad concept that criminal defendants may not be required to prove their innocence. Fears also asserts that the jury instructions violated Ohio law, but as the Supreme Court has made clear, "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citation omitted).

The Supreme Court has made clear that courts may not grant relief solely because the jury instructions contain technical and unsubstantial errors:

> The only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. It is well established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction . . . we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. And we also bear in mind our previous admonition that we have defined the category of infractions that violate fundamental fairness very narrowly.

*Id*. at 72-73 (internal quotation marks and citations omitted). Given this high standard, we cannot say that the instruction, when considering the trial as a whole, so misled the jury that it placed an artificial burden on Fears. In fact, the prosecution itself told the jury "[y]ou have to find beyond a reasonable doubt *that we have proved to you* that Angelo Fears purposely killed Antwuan Gilliam during commission of a kidnapping" (emphasis added) and that "we have kept our promise to you [that] we would prove . . . purposeful killing with prior calculation and design." Fears is unable to point to any evidence indicating that the jury relied on the instruction in a way that made the trial fraught with infirmity. Rather, he cites the standard of "reasonable likelihood" and states, without more, that there is a reasonable likelihood that the jury applied the instructions in an improper way.

Even if we were to determine that the instructions were misleading, such concern is not enough to grant the writ. Fears argues that the state court's decision deserves no deference because it did not consider federal law when it assessed the instruction. Such an argument misunderstands AEDPA jurisprudence. The state court need not identify federal law in its decision to be given deference. *Slagle*, 457 F.3d at 513-514 ("The state-court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them."). Rather, all that is required is that the Ohio Supreme Court's "result and reasoning" be "consistent with Supreme Court precedent." *Id.* (citation

omitted). As Fears cannot show that the Ohio Supreme Court's decision was an unreasonable application of clearly established federal law, this claim also fails.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court, denying the petition.